THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff in Error, *vs.* THE WILLIAM HENNING COMPANY, Defendant in Error.

*Opinion filed December 17, 1913.*

1. PURE FOODS—*object of section 11 of Pure Food act is to prevent imitation of cider vinegar.* The provision of section 11 of the Pure Food act that "all vinegar made wholly or in part from distilled liquor shall be branded 'Distilled Vinegar' and shall not be colored in imitation of cider vinegar," was intended to prevent the imitation of cider vinegar, whether the coloring of the distilled vinegar is done by adding coloring matter, such as caramel, or by mixing the distilled vinegar with sugar vinegar.

2. SAME—*when sale of vinegar is a violation of the Pure Food act.* The sale of vinegar composed of distilled vinegar and sugar vinegar mixed in such proportions as to produce the color of cider vinegar is a violation of section 11 of the Pure Food law, though the barrels containing the product are plainly branded, "A compound of White Distilled and Sugar Vinegar," as the provisions of section 11 relating especially to vinegar control that product, regardless of that part of section 9 of the act relating to the sale of products plainly branded as compounds and containing no poisonous or deleterious ingredient.

3. CONSTITUTIONAL LAW—*courts will not hold a statute unconstitutional in a doubtful case.* The presumptions are in favor of the constitutionality of a statute, and courts will, if possible, give it such a construction as will sustain it and will hold it unconstitutional only when it is clearly so.

4. SAME—*police power authorizes regulation to prevent fraud and deceit.* Under the general police power of the State the legislature may make regulations to prevent fraud and deceit as well as for the public health, safety and comfort, and, in connection with the regulation of food products, may prohibit the use of coloring matter or the mixing of harmless ingredients of the same general nature in such a way as to deceive or mislead the public into accepting the compound for another product.

5. SAME—*section 11 of Pure Food act, relating to vinegar, is not unconstitutional.*   Section 11 of the Pure Food act, relating to vinegar, and intending, in part, to prevent fraud in selling as genuine cider vinegar another vinegar colored in imitation of cider vinegar, is not unconstitutional.

6. SAME—*word "adulterated," used in title of Pure Food act, construed.*   The word "adulterated," used in the title of the Pure Food act, covers the mixing of distilled vinegar and sugar vinegar in such proportions as to produce a product having the color of cider vinegar, as the manufacture of such compound is contrary to the intent of section 11, which provides that vinegar shall be held to be adulterated, within the meaning of the act, if it is manufactured contrary to its provisions.

WRIT OF ERROR to the Municipal Court of Chicago; the Hon. FREDERICK L. FAKE, Judge, presiding.

P. J. LUCEY, Attorney General, MACLAY HOYNE, State's Attorney, (CHARLES F. MCKINLEY, ZACH HOFHEIMER, and EDMUND K. JARECKI, of counsel,) for the People.

LANNEN & HICKEY, for defendant in error.

Mr. JUSTICE CARTER delivered the opinion of the court:

This was an action of debt brought in October, 1912, in the municipal court of Chicago, to collect a fine for a violation of the Pure Food statute enacted in 1907, as amended in 1911. The trial court found defendant in error not guilty and entered judgment accordingly. From that judgment this writ of error was sued out.

The first, and perhaps chief, controversy is as to the proper construction of section 11 of said statute. It is, however, further insisted by counsel for defendant in error that if the construction contended for by them is not correct, the statute is unconstitutional in so far as it is attempted to be enforced against their client.

Section 11 reads as follows: "All vinegar made by fermentation and oxidation without the intervention of distillation, shall be branded with the name of the fruit or

substance from which the same is made. All vinegar made wholly or in part from distilled liquor shall be branded 'Distilled Vinegar,' and shall not be colored in imitation of cider vinegar. All vinegar shall be made wholly from the fruit or grain from which it purports to be or is represented to be made, shall contain no foreign substance, and shall contain not less than four per cent, by weight, of absolute acetic acid. Any vinegar made or manufactured contrary to the provisions of this section shall be deemed to be adulterated within the meaning of this act. Any vinegar which is not branded as herein provided shall be deemed to be misbranded within the meaning of this act." (Hurd's Stat. 1911, p. 2215.)

The case was tried without a jury and various special findings of fact and propositions of law were presented to the court and held or refused.

From the record it appears that defendant in error, the William Henning Company, on or about March 13, 1912, sold and delivered to the Joliet Grocery Company of Joliet, Illinois, five barrels of vinegar, each containing about fifty gallons; that on the head of each barrel there was stenciled in large, plain, black letters the following: "William Henning Co.—A compound of White Distilled and Sugar Vinegar, Chicago." Said vinegar was composed of white distilled vinegar and sugar vinegar, the latter being sometimes known as molasses vinegar. The evidence showed it contained somewhere between ten and twenty-five per cent of sugar vinegar. It further appears that both distilled and sugar vinegar, or a compound of both, are wholesome and nutritious articles of food, and that this compound contained no poisonous or deleterious ingredients; that distilled vinegar is an almost colorless liquid, generally made from corn; that sugar or molasses vinegar is made from molasses, usually of a grade commercially known as "black strap," and is of a very dark-brown color; that cider vinegar has a distinct amber color, although it may

vary some, according to the character of the fruit, the time
when made, the length of storage, how bottled and how
handled.   The court found that in the manufacture and
production of this compound vinegar there was a design
to give it the color which it bore, and in the proportion
in which this was mixed it gave the final product the color
of cider vinegar, and that this was the intention of the de-
fendant in error; that the effect of adding from ten to
twenty-five per cent of sugar vinegar to the distilled vine-
gar was to give to the mixture a color closely resembling
the color of cider vinegar, and while some vinegar dealers
could readily distinguish a compound so made from cider
vinegar by the absence of apple flavor and the presence of
a slight flavor of molasses, it was doubtful whether the
ordinary consumer could so distinguish; that the color of
the compound was due solely to the mixing of the two
ingredients in the proportion in which mixed; that sugar
vinegar has such a strong flavor and dark color that it is
practically unsalable for table use unless mixed with white
distilled vinegar to reduce it; that defendant was a large
manufacturer of sugar vinegar but did not manufacture
distilled vinegar; that one of the objects in mixing them
was to make the sugar vinegar salable; that the cost of a
compound vinegar such as that in question was consider-
ably cheaper to the consumer than cider vinegar, the latter
being sold by stores at from twenty-five to thirty cents a
gallon while compound vinegar was sold at stores at from
fifteen to twenty cents per gallon; that it was the custom
in the vinegar trade, up to within about four years ago,
to color distilled vinegar with caramel color, using about
two ounces of liquid caramel to color a barrel of forty-five
or fifty gallons of distilled vinegar, which would give it
the color of cider vinegar.   These findings were supported
by the evidence in the record.

From the findings of the court and the briefs of coun-
sel it is evident that the court found the defendant in er-

ror not guilty on the ground that section 11 of the Pure Food act, properly construed, did not apply to a mixture of sugar vinegar and distilled vinegar in substantial proportions, even though the resulting mixture had a color similar to that of cider vinegar, provided the mixture was properly labeled. The defendant in error insists that, construing section 11 with the rest of the Pure Food act, the trial court's construction of section 11 must necessarily be upheld.

In arriving at the proper construction to be placed upon an act of the legislature it is proper to ascertain the purpose and object of the law and the evil to be remedied by its passage. (2 Lewis' Sutherland on Stat. Const.— 2d ed.—sec. 456; *Bobel* v. *People,* 173 Ill. 19.) Clearly, it was one of the purposes of the act to prevent the sale as cider vinegar of other vinegars so similar in appearance that the ordinary purchaser could not distinguish between them. The evidence disclosed that previous to the passage of this law it was the practice to color distilled vinegar with a small amount of burnt sugar, (commonly called caramel,) which had the effect of giving the finished product the characteristic amber color of cider vinegar. It seems to be conceded that such practice now would plainly be in violation of said section 11. But is not this mixture here just as much an imitation and just as liable to mislead as the old method? The new compound is plainly an intentional imitation of cider vinegar, otherwise there would be no purpose in making it the color in question. The object of the Pure Food act was to protect not only the dealer and jobber but the retail purchaser or consumer, otherwise the law would be of little practical value. The distinctive color of cider vinegar is one of the means employed by the retail purchaser to judge whether he is getting that article. Practically every householder is familiar with cider vinegar. Its appearance and color are as well understood as its taste. Indeed, from the evidence in this record it ap-

pears that it is more readily recognized from its charac-
teristic color than by its taste. No law has been called to
our attention forbidding the manufacture of white distilled
vinegar or of sugar vinegar. They can be sold without re-
straint as separate articles of trade. Obviously, however,
the compounding of them was for the purpose of making
the compound more salable than if sold separately. How
can it be reasonably argued that this was not done for the
purpose of deceiving the purchaser?

The contention of counsel for defendant in error that
the entire act should be read together in order to get its
true intent and meaning is undoubtedly the law. This
court so held in construing this very act in *People* v. *Price,*
257 Ill. 587.

Counsel insist that the sale of these five barrels of vine-
gar, plainly branded, is not prohibited by law if we con-
strue section 11 with that part of section 9 which reads:
*"Provided,* that an article of food which does not contain
any added poisonous or deleterious ingredients shall not be
deemed to be adulterated or misbranded in the following
cases: * * * Second, in case of articles labeled, branded
or tagged so as to plainly indicate that they are compounds,
imitations or blends, and the word 'compound,' 'imitation'
or 'blend,' as the case may be, is plainly stated on the pack-
age in which it is offered for sale," etc. (Laws of 1911,
p. 523.) The sentence of said section 11 which it is spe-
cially necessary to construe in reaching a proper conclusion
on this question reads: "All vinegar made wholly or in
part from distilled liquor shall be branded 'Distilled Vine-
gar,' and shall not be colored in imitation of cider vinegar."
What meaning, if any, will be left to the last clause of the
sentence just quoted if the contention of counsel for de-
fendant in error be upheld? Counsel contend that that
clause only refers to coloring by some coloring matter and
not by the combination of two ingredients of the same gen-
eral nature, neither of them injurious to health and both

wholesome as food. It is not the mixing of the two vinegars which is prohibited but the deliberate production of a vinegar in imitation of cider vinegar. Intentional imitation is the gist of the offense. If the article thus produced is an imitation of the article forbidden to be imitated, it matters not whether such imitation is produced by the addition of dye or by the mixing of another kind of vinegar. Color is the impression upon the eye. The words "shall not be colored in imitation of cider vinegar," mean a conscious imitation, in the manufacture, of the article forbidden. This meaning as to these words has been sustained in construing very similar statutes in other States. *Meyer* v. *State,* 134 Wis. 156; *Waller* v. *State,* 53 Ohio St. 77; *Commonwealth* v. *Mellett,* 27 Pa. Super. Ct. 41; *Commonwealth* v. *Caulfield,* 211 Pa. St. 644.

Reading this entire law together, it is evident the intent of the legislature was that the provisions of sections 8 and 9 of the Pure Food act, so far as applicable, should govern all food products, but plainly in various other sections there are special regulations inserted to govern the particular food specified, otherwise such special regulations would have no meaning. That the legislature intended that the special provisions as to vinegar in section 11, on the questions here involved, should govern, rather than the general provisions of the act, is quite manifest from the fact that the amended act passed in 1911 added the last two sentences in section 11, reading: "Any vinegar made or manufactured contrary to the provisions of this section shall be deemed to be adulterated within the meaning of this act. Any vinegar which is not branded as herein provided shall be deemed to be misbranded within the meaning of this act." Manifestly, the first sentence of the amendment to section 11 just quoted applies to the compound mixture here in question, and if read in connection with the second sentence of the section, that all vinegar made wholly or in part from distilled liquor shall be branded distilled vinegar and shall

not be colored in imitation of cider vinegar, there can be no escape from the conclusion that this mixture, under section 11, must be "deemed to be adulterated within the meaning of this act." If there were any doubt as to the meaning of said section 11 as it was passed in 1907 we think there can be no doubt after the amendment of 1911. The conclusion seems irresistible that the legislature intended by this amendment to answer the very argument now made by counsel for the defendant in error as to the meaning of this section of the act as to misbranding and adulterating vinegar.

Counsel for defendant in error further argues that if this is the proper construction of the Pure Food act then said act is unconstitutional and void on the ground that the regulation thus attempted is unreasonable. If this statute be upheld it must be under the police power of the State. That power includes the right to make regulations for the prevention of fraud and deceit as well as for the public health, safety and comfort. It has been defined as that inherent plenary power in the State which permits it to prohibit all things hurtful to the comfort, welfare and safety of society. It "is co-extensive with self-protection, and is not inaptly termed 'the law of overruling necessity.' " (*Town of Lake View* v. *Rose Hill Cemetery Co.* 70 Ill. 191; *Ritchie & Co.* v. *Wayman,* 244 id. 509.) If under this power the public authorities should prohibit that which is harmless in itself or command that to be done which does not tend to promote the health, welfare or safety of society, such action would be an unauthorized exercise of power. (*Toledo, Wabash and Western Railway Co.* v. *City of Jacksonville,* 67 Ill. 37; *City of Belleville* v. *Turnpike Co.* 234 id. 428.) The public health requires that food should be absolutely and unquestionably pure. In order to accomplish this the legislature may legislate against fraud or deception by false coloring. They may forbid this by the use of coloring matter or dye, or they may do so by

260 — 36

forbidding the mixing of two or more ingredients of the same general nature in such a way as to deceive or mislead the public. A false color is sometimes more liable to deceive than a false brand. Evidently the false color here, although harmless in the sense of being injurious to the health, was intended to deceive, and it rendered the vinegar a counterfeit of the genuine product. Every consumer has the right to distinguish for himself what an article of food is, and have the means of judging for himself, uninfluenced by deception, its quality and value.

The presumptions are in favor of the constitutionality of a law passed by the legislature, and the courts will, if possible, give it such construction as to enable it to have that effect. The holding of a statute void is coupled with such grave responsibilities that it has long been the settled rule of this court that such power will not be exercised except in clear cases. (*Hawthorn* v. *People,* 109 Ill. 302; *People* v. *Thompson,* 155 id. 451; *People* v. *Dunne,* 258 id. 441.) It may be that the regulation provided for in section 11 will embarrass the dealers in this class of goods. The prudence of such a regulation may be debatable but it is not indefensible. It is well known that the adulterating of food products has grown to such an enormous extent as to menace the health of the people. To redress such evils is a plain duty but a difficult task. In discussing a statute controlling the manufacture and sale of oleomargarine, in *Powell* v. *Pennsylvania,* 127 U. S. 678, the United States Supreme Court, in an opinion by Mr. Justice Harlan, said (p. 686): "If all that can be said of this legislation is that it is unwise or unnecessarily oppressive to those manufacturing or selling wholesome oleomargarine as an article of food, their appeal must be to the legislature or to the ballot-box,—not to the judiciary. The latter cannot interfere without usurping powers committed to another department of government." The courts construe the laws—they do not make them. In case of unwise, though consti-

tutional, legislation by the representatives of the people, "the people, in their sovereign capacity, can correct the evil, but courts cannot assume their rights. The judiciary can only arrest the execution of a statute when it conflicts with the constitution. It cannot run a race of opinions upon points of right, reason and expediency with the law-making power." (Cooley's Const. Lim. chap. 7, p. 236.)

This court, in *City of Chicago* v. *Bowman Dairy Co.* 234 Ill. 294, held that the regulation and sale of milk and cream in bottles and glass jars by a city was a proper exercise of the police power, and in *City of Chicago* v. *Schmidinger,* 243 Ill. 167, that a bread ordinance of the city of Chicago which fixed the size of loaves of bread and regulated the sale of the bread was a valid exercise of the same power. This last decision was upheld by the United States Supreme Court in *Schmidinger* v. *City of Chicago,* 226 U. S. 578, the opinion in the last case stating that the fixing, by ordinance, of a standard as the size of bread loaves was not "such an unreasonable and arbitrary exercise of legislative power as to render it unconstitutional and void." In construing the oleomargarine law in *People* v. *Freeman,* 242 Ill. 373, it was said (p. 379) : "Dealers in oleomargarine and other substitutes for butter have no vested right to palm off their products on purchasers who ask for butter as the genuine article they are seeking. The purpose of the act was to protect the public against fraud of this kind by preventing the vendor of any substitute for butter from using coloring matter therein to impose upon his customers and deceive them into believing they were purchasing butter when they were purchasing a different thing. The prevention of such a fraud by prohibiting the sale as genuine dairy butter of any article made in imitation of butter is clearly within the police power." One object of the provisions of said section 11 was to make it impracticable to commit the fraud of selling as genuine cider vinegar another vinegar "colored in imitation of cider vinegar."

The prevention of such a deception is clearly upheld by the reasoning of the decisions in this and other jurisdictions. See in addition to the cases already cited, *People* v. *Arensberg,* 105 N. Y. 123; *State* v. *Addington,* 77 Mo. 110; *Plumley* v. *Massachusetts,* 155 U. S. 461; *State* v. *Earl,* 152 Mo. App. 235; *People* v. *Girard,* 145 N. Y. 105.

Counsel for defendant in error further argue that with this construction of section 11 the law is void, under section 13 of article 4 of the constitution, because the title to the act only prohibits and prevents "the manufacture and sale of unhealthful, adulterated or misbranded food, liquors or dairy products," and they argue that the word "adulterated" here clearly means a harmful adulteration or misbranding; that the meaning of adulteration is the act of corrupting or debasing a pure or genuine article by mixing with it something impure or spurious. In Webster's New International Dictionary among the definitions of "adulterate" is the following: "Articles are adulterated to increase their weight or bulk or to improve or change their appearance or falsify in imitation of an article of higher grade or different kind. Various statutes regulating the sale of food, drugs and liquors have provided that articles shall be deemed to be adulterated under various conditions, not involving the addition of any spurious article." In the Century Dictionary (1911 ed.) "adulteration" is defined as "the act of adulterating, or the state of being adulterated or debased by admixture with something else, generally of inferior quality; the use, in the production of any professedly genuine article, of ingredients which are cheaper and of inferior quality, or which are not considered so desirable by the consumer as other or genuine ingredients for which they are substituted." Section 11 of the Pure Food law says that vinegar shall be held to be adulterated, within the meaning of the act, if it is manufactured contrary to its provisions. We have held in this opinion that this compound is manufactured contrary to the provisions of this

act. Under the definitions of the word given by these standard lexicographers, the meaning of the word "adulterated" in the title of the act is broad enough to cover the construction here placed upon said section 11. The law is therefore not unconstitutional on this ground.

On this record it must be held that the municipal court of Chicago erred in the judgment rendered, and that judgment will be reversed and the cause remanded for further proceedings in harmony with the views herein expressed.

*Reversed and remanded.*